NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

JAC 11-355

CONSOLIDATED WITH

JAC 11-356


STATE OF LOUISIANA
IN THE INTEREST OF  M.N.H.

CONSOLIDATED WITH

IN THE INTEREST OF M. N. H.



**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. J-2186 C/W NO. J-2440
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Jimmie C. Peters, Judges.



AFFIRMED.



Robert L. Kennedy
Attorney at Law
352 2nd Street
Colfax, LA 71417
(318) 627-3255
COUNSEL FOR APPELLEE:
       M. N. H. (child)

**James Francis Slaughter**
**Attorney at Law**
**403 Second Street**
**Colfax, LA 71417**
**(318) 627-2240**
**COUNSEL FOR APPELLEE:**
> **R. H. (mother)**

**Brian K. Thompson**
**Attorney at Law**
**P. O. Box 13984**
**Alexandria, LA 71315**
**(318) 473-0052**
**COUNSEL FOR INTERVENOR/APPELLANT:**
> **K. L. (paternal grandmother)**
> **M. L. (paternal step-grandfather)**

**PETERS, Judge.**

This dispute originated when the State of Louisiana through the Department of Social Services, Office of Community Services (OCS) removed the minor child, M.N.H., from his mother, R.H.[1]  OCS placed M.N.H. in the care of his paternal grandmother, K.L., and her husband, M.L.  Two and one-half years later M.L and K.L. filed a petition to terminate R.H.'s parental rights, seeking to adopt M.N.H.  OCS also filed a petition to terminate R.H.'s parental rights, and the two suits were consolidated by the trial court.  The trial court rendered judgment denying both petitions, transferring custody of M.N.H. from OCS to K.L. and M.L., awarding R.H. supervised visitation with her son on a weekly basis, and ordering OCS to close its file and cease providing services to R.H.  M.L and K.L. appeal from that portion of the trial court's judgment denying their petition to terminate R.H.'s parental rights.  For the following reasons, we affirm the trial court judgment.

## DISCUSSION OF THE PROCEDURAL RECORD

M.N.H. is a minor child born on May 30, 2007, to a relationship between his mother, R.H., and his father, M.A.A.[2]  He was removed from his mother's physical custody in April of 2008, and placed in the custody of OCS.  OCS then placed the child with his paternal grandmother, K.L. and her husband, M.L.  Since that time, M.N.H. has resided with K.L. and M.L.

As required by La.Ch.Code art. 673, OCS promulgated an initial case plan within sixty days of having been awarded M.N.H.'s custody, and filed the case plan with the trial court on May 13, 2008.  The case plan provided a permanency plan of M.N.H.'s reunification with his mother."[3]  Additionally, the case plan confirmed that M.N.H. had been placed in the physical custody of K.L., but also noted that the

---

[1]The initials of the child and his relatives are used to protect the identity of the minor children.  Uniform Rules-- Courts of Appeal, Rules 5-1, 5-2.

[2]The child's father, M.A.A., died before M.N.H.'s birth.

[3]The case plan pointed out that M.N.H.'s situation did not meet the legal requirements for termination of parental rights and adoption.

grandmother had not committed to adopt her grandchild if he became available for adoption. After a July 9, 2008 hearing, and pursuant to La.Ch.Code art. 666, the trial court adjudicated M.N.H. as a child in need of care and left him in OCS's custody. The trial court signed a judgment to this effect on July 11, 2008. This was followed by a dispositional hearing held on August 13, 2008, wherein the trial court rendered a judgment ordering that M.N.H. remain in the custody of the State of Louisiana pending further orders of the trial court and specifying the particulars of R.H.'s visitation privileges and rehabilitation obligations. The trial court executed a judgment to this effect on August 25, 2008.

By a pleading filed August 25, 2008, K.L., M.L., and M.A.A.[4] attempted to intervene in the proceedings. In doing so, they suggested that they wished "to facilitate the permanent plan for the child and to insure that the best interests of the minor child are protected." After a September 10, 2008 hearing, the trial court granted the intervention. The judgment arising from the September 10 hearing not only confirmed the intervention right, but also gave the intervenors access to OCS's internal records.

The next two case plan review reports submitted to the trial court both recommended the same action – that the trial court maintain the case in the existing status. Additionally, they both suggested that OCS's primary goal remained M.N.H.'s reunification with his mother with a secondary goal of custody transfer. The first report was submitted on September 15, 2008, and the second on March 18, 2009. The trial court accepted the recommendations of the first by a judgment executed on October 29, 2008, but before a hearing could be held on the March 18, 2009 submission, the intervenors filed an opposition to the case plan recommendations.

The opposition, which the intervenors filed on April 1, 2009, asserted that they objected to the consideration of reunification by OCS. While suggesting that

---

[4]M.A.A. is the child's paternal grandfather.

2

reunification with his mother would not be in M.N.H.'s best interests, the intervenors offered no alternative other than to vaguely suggest that "[they] have been and remain ready, willing and able to provide a permanent home for the minor child in their home." The pleading does not suggest which home, the paternal grandmother's or the paternal grandfather's, was being offered as the "permanent home" and mentions nothing about the possibility of adoption.

The hearing on the March 18, 2009 report and the intervenors' opposition began on April 1, 2009, but was not completed on that day. Before the evidentiary phase of the proceedings was completed on May 6, 2009, and with the trial court's permission, OCS submitted a supplemental report that had been prepared on April 21, 2009. In this report, the primary goal remained reunification, but the secondary goal was changed to adoption. In the cover letter to the trial court, OCS suggested that its plan was "to re-staff the case within three months to determine a case plan goal for this family." After completing the hearing on May 6, 2009, the trial court entered judgment maintaining M.N.H.'s custody with the State of Louisiana and approving the March 18, 2009 report as amended by the April 21, 2009 supplemental report.

On September 24, 2009, OCS submitted a case plan review report to the trial court that had been prepared on September 11, 2009. In this report, OCS informed the trial court that it had decided to convert the case plan's goal from reunification to making M.N.H. available for adoption. In that regard, OCS had decided to file pleadings to terminate R.H.'s parental rights. However, the final paragraph of the report states that OCS requests that the trial court enter judgment maintaining the current status. In two different attachments to the report, OCS asserted that reunification was still the primary goal with adoption being secondary.

The September 24, 2009 submittal by OCS resulted in a trial court judgment being executed on October 14, 2009, approving OCS's case plan report and continuing M.N.H.'s custody in the State of Louisiana. However, neither the

judgment nor the minutes of the proceedings held on October 14, 2009, address the discrepancies in the OCS report and the record does not contain a transcript of the proceedings giving rise to this judgment. We conclude, however, that the judgment endorsed the adoption option because, on December 14, 2009, OCS forwarded a letter to the trial court asserting that it had "changed the goal for [R.H.] and [M.N.H.] again to reunification." Although this correspondence was nothing more than an information letter, the intervenors responded to this correspondence by filing, on February 3, 2010, a pleading opposing the proposed alteration of the goals previously approved by the trial court.

On March 15, 2010, OCS submitted another case plan review report to the trial court. The report had been prepared March 12, 2010, and reaffirmed OCS's position in its December 14, 2009 letter in that it listed the primary goal as reunification and a secondary goal of adoption. In the report, OCS stated "[t]he case was re-staffed on December 14, 2009 and it was determined [the mother] had started to work her case plan. The goal for [M.N.H.] was changed from Adoption back to reunification. The agency sent a letter to the court on December 14, 2009 stating the reasons for changing the goal back to reunification." OCS noted in this plan that K.L. and M.L. were not in agreement with the reunification goal.

The issues raised by the intervenors' opposition and the March 15, 2010 report were not heard by the trial court until August 27, 2010. After hearing evidence on the issues, the trial court rendered a judgment rejecting OCS's recommendations set forth in its March 15 report. The judgment signed on August 31, 2010, ordered that a new case plan review hearing be held on October 6, 2010.

Obviously reacting to the trial court's rejection of its reunification recommendation, OCS's September 10, 2010 case plan review report changed its primary goal for M.N.H. to adoption. In its report, OCS noted for the first time in the history of the litigation that K.L. and M.L. were willing to adopt M.N.H. In its

4

recommendation to the trial court, OCS stopped short of recommending termination of R.H.'s parental rights. Instead, OCS recommended that M.N.H. remain in the custody of the State of Louisiana, that R.H.'s visitation rights be made less frequent, and that the primary goal be changed to adoption.

Before a hearing could be held on the new recommendations, the intervenors filed a separate suit seeking termination of R.H.'s parental rights.[5] The trial court ordered R.H. to show cause on November 3, 2010, why her parental rights should not be terminated.

Despite setting the November 3, 2010 show cause hearing, the trial court held the previously scheduled October 6, 2010 hearing to review the most recent report from OCS. At the end of this hearing, the trial court rendered judgment continuing M.N.H.'s custody with the State of Louisiana and approving the recommendations in OCS's most recent report. Without noting the existence of the other pending suit, the trial court set the next case plan review hearing for April 6, 2011.

On October 28, 2010, OCS filed a petition to terminate R.H.'s parental rights and to have M.N.H. certified for adoption. The trial court set a parental rights termination hearing for January 5, 2011, and, sometime thereafter, consolidated the intervenors' separate suit with OCS's petition for relief. After hearing the evidence presented at the January 5, 2011 trial, the trial court took the issues under advisement. On January 21, 2011, the trial court issued a judgment denying both requests for termination of R.H.'s parental rights and transferring M.N.H.'s legal custody from the State of Louisiana to K.L. and M.L.[6] The trial court then awarded R.H. specific

---

[5]K.L. and M.L. filed their petition to terminate R.H.'s parental rights under La.Ch.Code art. 1004(G), which allows foster parents who intend to adopt their foster child to petition for termination under certain circumstances: "[f]oster parents who intend to adopt the child may petition for the termination of parental rights of the foster child's parents when, in accordance with Article 702(D), adoption is the permanent plan for the child, the child has been in state custody under the foster parent's care for seventeen of the last twenty-two months, and the department has failed to petition for such termination." La.Ch.Code art. 1004(G). This court has noted that this subsection was added to help ensure that children do not languish in permanent foster care and to expand the rights of foster parents who would adopt their foster children. *In Re C.F.*, 01-666 (La.App. 3 Cir. 10/3/01), 796 So.2d 922.

[6]The trial court stated that it made its disposition under La.Ch.Code art. 1039(B)(G), which provides that "[i]f the court finds that the alleged grounds are not proven in accordance with the evidentiary standards set forth in Article

visitation privileges, ordered that OCS cease providing services to R.H., and ordered OCS to close its file in this matter.

Initially OCS appealed as did K.L. and M.L. However, OCS has since dismissed its appeal and the only issue remaining before us is the one raised by K.L. and M.L. in their appeal: "[w]hether the Trial Court erred in finding that there was no evidence presented showing that the termination of parental rights as to the Defendant-Appellee was in the best interests of the minor child."

**OPINION**

In order to terminate parental rights the petitioners need to establish at least one of the statutory grounds set out in La.Ch.Code art. 1015 by clear and convincing evidence. *State ex rel. J.A*, 99-2905 (La.1/12/00), 752 So.2d 806. In its written reasons for judgment the trial court found that the petitioners established grounds for termination of R.H.'s parental rights under La.Ch.Code art. 1015(4)(b) when they proved by clear and convincing evidence that R.H. had failed to support M.N.H. for at least six months prior to the filing of the petitions to terminate parental rights, even though she had the ability to provide some support. The trial court also found that the petitioners had established an alternate basis for termination of R.H.'s parental rights under La.Ch.Code art. 1015(5), because they met their burden of proving by clear and convincing evidence that R.H. had failed to substantially comply with the conditions of her case plan for a period in excess of one year and that there is no reasonable expectation that she would significantly improve in the near future considering M.N.H.'s age and his need for a safe, stable, and permanent home.

However, even after finding that one or more of La.Ch.Code art. 1015's statutory grounds has been established, the trial court should not terminate a parent's rights unless it determines that the termination is in the best interests of the child.

1035 or if the court finds that termination of parental rights is not in the best interests of the child, it shall enter written findings on both issues and may: . . . (6) Make any other disposition that is in the best interest of the child."

La.Ch.Code art. 1037(B), *State ex rel. J.A*, 752 So.2d 806.  The existence of one or more of the statutory elements required for the termination of parental rights under La.Ch.Code art. 1015 does not does not inherently satisfy the additional requirement under La.Ch.Code art. 1037(B) that termination be in the best interests of the child. *State in the Interest of P.S.T.*, 09-695 (La.App 3 Cir. 5/6/09), 11 So.3d 565.  Here, the trial court found that the termination of R.H.'s parental rights was not in M.N.H.'s best interests and accordingly denied the petitions to terminate R.H.'s parental rights. K.L. and M.L. appeal this portion of the trial court's judgment.  This court reviews the trial court's findings in an involuntary termination of parental rights case under the manifest error standard of review.  *State in the Interest of K.G. and T.G.*, 02-2886, 02-2892 (La. 3/18/03), 841 So.2d 759.

At the January 5, 2011 hearing, the trial court heard testimony from Alice Tademy, a social worker with the Grant Department of Children and Family Services who had been working with R.H. and M.N.H. since April 16, 2008; Dr. David G. Atkins, a Shreveport, Louisiana clinical psychologist; K.L.; O.D.A., who is M.N.H.'s paternal great-grandmother; and R.H.

Ms. Tademy testified that R.H., who was nineteen or twenty when M.N.H. was removed from her custody, had not had her own home or any employment until November of 2010, when she obtained a two-bedroom trailer and a job at Wal-Mart. By the January 5, 2011 hearing R.H. had a job, a place to live, and a car.  Ms. Tademy testified that M.N.H. had not bonded with R.H., explaining that M.N.H. had bonded with K.L. and M.L. and that M.N.H.'s visits with his mother were more a playing interaction than a parenting interaction.  Ms. Tademy also said that R.H. frequently called to cancel or reschedule her visits with M.N.H. at the last minute and sometimes left the visits early.

Dr. Atkins was accepted as an expert in clinical psychology.  He had examined R.H. on June 10, 2008; November 3, 2009; and December 16, 2010.  After his initial

evaluation, Dr. Atkins diagnosed R.H. with a history of substance abuse, depression, and anxiety. He recommended that her visitation with M.N.H. be supervised, that she undergo substances abuse rehabilitation, drug screens, treatment for her anxiety and depression, parenting skills training, and individual therapy. Dr. Atkins said that it was important that R.H. show that she had the capacity to support herself and her child. After his second visit with R.H., in 2009, Dr. Atkins believed that her substance abuse was in remission and that she showed no signs of depressive or anxiety disorders. He found her to be fairly emotionally stable, participating in her case plan, having completed some of the goals of her case plan, and with no signs of depressive and anxiety disorder. At the December 16, 2010 evaluation, Dr. Atkins saw no signs of a current mental disorder. However, R.H. had stopped submitting to drug tests; Dr. Atkins was concerned that she might be lying when she said that she was not using illegal drugs. At that time he diagnosed her with an adjustment disorder with a depressed mood which was in sustained remission. He also diagnosed her with methamphetamine abuse, also in sustained remission. He testified that she had made no significant progress toward rehabilitation on her substance abuse. Dr. Atkin's opinion was that R.H. was not likely to make lasting changes on her own. His biggest concern is that since June of 2010, for a six-month period, she had failed to comply with requested drug screenings.

K.L. testified that R.H. had dated her son (M.N.H.'s father) off and on before her son's death. She testified that she wants to adopt M.N.H. and give him a suitable and stable home. K.L. said that she believed that termination of R.H.'s parental rights is in M.N.H.'s best interests because then he will have more stability and will know where he will be.

O.D.A. testified that she frequently babysits M.N.H. while K.L. is at work, at least two days a week. She said that a continuing problem is that M.N.H. does not want to be alone with his mother.

8

R.H. testified that she now has a daughter, born in April 12, 2010, who lives with her. R.H. said that most of her drug screens were negative and that she does not drink alcohol. She suggested that a December 15, 2009 positive test for benzodiazepine was a false positive caused by a prescription drug she was taking. And R.H. explained a May 24, 2010 positive test for amphetamines as being a false positive because she was taking a multi-symptom allergy and cold medicine. R.H. asked to be reunited with M.N.H., saying:

> I mean, I know I messed up. I know I did wrong. And that was very horrible and I know that. But, those are my kids and I love them. And I will do the best in my power and my knowledge and anything I can possibly do to make sure their lives are better than mine will ever, ever be.

We adopt the trial court's reasons, as set out in its written findings of fact, explaining its decision not to terminate R.H.'s parental rights:

> Although there was testimony that [R.H.] often sought to change visitation times or ended the visits early, the testimony did establish that [R.H.] visited with [M.N.H.] on a regular basis. Although their interaction was described as being more "playful" than that of a "mother-child bond", the Court does not find that surprising given that [M.N.H.] has not been in his mother's custody since he was eleven months old. Although this Court has previously found that [R.H.] failed to substantially comply with her case plan, [R.H.] has made some progress towards reaching her case plan goals. As previously noted, at the time of trial [R.H.] was working at Wal-mart, raising her infant daughter and had obtained housing. While this Court is uncertain as to whether or not [R.H.] will ever resolve her substance abuse issues or be able to provide a stable environment for [M.N.H.], the Court is not convinced that severing the child's relationship with his mother is in his best interest. See *State in the Interest of C.D. and J.C. v. L.C.*, 01-663 (La.App. 3 Cir. 10/3/01), 796 [S]o.2d 844, *writ denied*, 01-2986 (La. 11/20/01), 801 [S]o.2d 1079.
>
> * * *
>
> [K.L. and M.L.] have been providing a wholesome, stable environment for [M.N.H.] since his removal from his mother's care. They have provided for him financially, physically and emotionally. [M.L. and K.L.] have worked with the State to facilitate a relationship between [M.N.H.] and his mother. [K.L. and M.L.] have faithfully attended hearings related to this proceeding and have expended considerable resources to seek to adopt [M.N.H.] The Court commends them for their involvement in [M.N.H.]'s life. However, no evidence was introduced at trial regarding any significant benefit or change for [M.N.H.]'s life if [R.H.]'s parental rights were terminated, other than

[K.L. and M.L.]'s desire to adopt him. Although there was testimony that [M.N.H.] would not visit with his mother without [K.L.] or [O.D.A.] present in the same room, there was testimony that [M.N.H.] knew his mother and playfully interacted with her during visits. Given that [R.H.] has made some effort to comply with her case plan goals and has maintained a relationship with [M.N.H.], combined with the fact that the Court anticipates that [M.N.H.] will remain in [K.L. and M.L.]'s home for the foreseeable future, this Court does not believe that completely severing the relationship between [M.N.H.] and [R.H.] would be in [M.N.H.]'s best interest.

Considering all of the testimony and evidence in the record of these proceedings, we find that the trial court did not manifestly err in finding that termination of R.H.'s parental rights is not in the best interests of M.N.H.

We note that the trial court's grant of custody to K.L. and M.L. does not constitute a permanent placement of M.N.H. as defined in La.Ch.Code art. 603(20), which states that "permanent placement" means return of the legal custody of the child to his parent, placement of the child with adoptive parents pursuant to a final decree of adoption, or placement of the child with a legal guardian.[7] R.H. can regain custody of M.N.H. by bringing an action to change custody and demonstrating that she has been rehabilitated, and that the facts which caused her to lose custody no longer exist. *Fowler v. Fowler*, 98-953 (La.App. 3 Cir. 12/9/98), 722 So.2d 125.

## DISPOSITION

We affirm the trial court judgment in all respects. We assess the costs of this appeal to the appellants, K.L. and M.L.

**AFFIRMED.**

> This opinion is NOT DESIGNATED FOR PUBLICATION.
> Uniform Rules—Courts of Appeal, Rule 2-16.3.

---

[7]Although this was not raised as an issue in this appeal, we also note that pursuant to the Adoption and Safe Families Act of 1997, U.S.C.A. 42 § 601, *et seq.*, states are mandated to establish "permanency plans" for children within the foster care system. The Adoption and Safe Families Act provides that such plans must demonstrate that the State made reasonable efforts to "preserve and reunify" the family. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian.